# UNITED STATES DISTRICT COURT
for the
Southern District of California



In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One Apple iPhone, Model 6, IMEI: 359230066633850, Serial Number: DNQPM2XZG5MC

Case No. 19MJ2348

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated herein)

located in the   Southern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 952, 960, and 963; 21 U.S.C. Sec. 843(b); 18 U.S.C. Sec. 2 | Importation of Methamphetamine; Conspiracy to Import Methamphetamine; Unlawful Use of a Communication Facility; Aiding and Abetting |

The application is based on these facts:

See attached Affidavit (incorporated herein)

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Andrew Crotzer, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  6/5/19

*Judge's signature*

City and state:  San Diego, California          Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| IN THE MATTER OF THE SEARCH OF<br><br>One Apple iPhone, Model 6, IMEI: 359230066633850, Serial Number: DNQPM2XZG5MC | **AFFIDAVIT OF SPECIAL AGENT ANDREW CROTZER IN SUPPORT OF A SEARCH WARRANT** |
|---|---|

I, Special Agent Andrew Crotzer, having been duly sworn, declare and state as follows:

## I.
## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic devices:

> Apple iPhone
> Model 6
> IMEI: 359230066633850
> Serial Number: DNQPM2XZG5MC
> (**Target Device**)

and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance (and Conspiracy to do the same); Title 18, United States Code, Section 2, Aiding and Abetting the Unlawful Importation of a Controlled Substance; and Title 21, United States Code, Section 843(b), Unlawful Use of a Communication Facility (the **Target Offenses**).

2. The **Target Device** was seized from Defendant Laura Rubio-Duran (**Defendant**) at the time of her arrest for Importation of Methamphetamine on March 18, 2019, at the San Ysidro Port of Entry. The **Target Device** was found in Defendant's vehicle at the time of her arrest. The **Target Device** is currently stored in the vault located at 9495 Customshouse Plaza in San Diego, California.

3. The search of the **Target Device** supports an investigation and prosecution of Defendant for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the **Target Device**, as described in Attachment A will produce evidence of the Target Offenses, as described in Attachment B.

4. The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II
## AFFIANT'S EXPERIENCE AND TRAINING

5. I have been employed as a Special Agent with HSI since June of 2018. I am currently assigned to the ICE/HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

6. During my tenure with HSI, I have participated in the investigation of numerous narcotics smuggling organizations, which have resulted in the issuance of search warrants, arrest warrants, and the indictments of persons for such crimes. In the course of my duties, I investigate and prepare for prosecution cases against individuals suspected of

bringing in and transporting narcotics into the United States with the intent to distribute; and individuals suspected of transporting bulk cash derived from narcotics proceeds out of the United States.

7. By virtue of my employment with HSI, I have performed various tasks which include, but are not limited to: functioning as a case agent, or co-case agent for investigations of narcotics smuggling organizations; functioning as a surveillance agent and thereby observing and recording the movements of persons suspected of narcotics smuggling; interviewing suspects, witnesses, and cooperating individuals with specific knowledge relevant to narcotics trafficking.

8. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

9. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I have had training in investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, Sections 952, 960 and 963.

10. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have learned that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, , pagers, and portable radios to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voice-mail messages referring to the arrangements

3

of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on where and when to deliver the controlled substances.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

    g. The use of cellular telephones and other mobile communication devices by conspirators or drug traffickers tends to generate evidence that is stored on the device, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

4

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that device.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training, education, and experience investigating these conspiracies, I have learned that searches of cellular/mobile telephones and/or other mobile communication devices yields evidence:

    a. tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

5

      d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

      e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

      f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III
## STATEMENT OF PROBABLE CAUSE

**A.   DEFENDANTS' ARREST**

14.    On March 18, 2019, at approximately 6:30 p.m., Defendant Laura Rubio-Duran applied for entry to the United States via vehicle lane #3 at the San Ysidro Port of Entry in San Diego, California. At the time, Defendant was driving a grey 2001 Lexus RX300 sport utility vehicle. Defendant was the driver and sole occupant of the Lexus, and it was registered under her father's name.

15.    Customs and Border Protection Officer (CBPO) Rodriguez was conducting primary inspections during this time. Defendant presented CBPO Rodriguez with her border crossing card (DSP-150) and a SENTRI card. CBPO Rodriguez asked Defendant where she was going and Defendant replied, "Plaza Bonita." Defendant also told CBPO Rodriguez she had nothing to declare.

16.    CBPO Rodriguez proceeded to conduct a cursory physical inspection of the vehicle. During the inspection, CBPO Rodriguez asked Defendant to unlock the Lexus's trunk and then checked the spare tire area (located underneath the floor of the rear cargo area). As CBPO Rodriguez checked this area, she discovered several packages wrapped in plastic and aluminum foil. Defendant saw CBPO Rodriguez discover the packages through the rear view mirror and said "it's sugar and fondant. I make cakes." CBPO Rodriguez then

6

called for assistance and Defendant was escorted to the security office while the Lexus was sent to an area for secondary inspection.

17. In the secondary inspection area, CBPO Angara conducted a physical inspection of the Lexus. CBPO Angara removed thirty-two packages from the spare tire well. These packages contained a substance that field-tested positive for the properties of methamphetamine and weighed a total of 50.24 kilograms (110.76 pounds). CBPO Angara also removed the **Target Device** during his search of the Lexus.

### B. DEFENDANT'S POST-*MIRANDA* STATEMENT

18. After her arrest, Defendant was advised of her *Miranda* rights. She elected to waive them and make a statement.

19. Defendant claimed she intended to travel to Nordstrom's and Wal-Mart before returning to Tijuana. She claimed her friend, Daniel Sanchez, gave her $400 to purchase shoes for his girlfriend, Gracia. She claimed she was going to Nordstrom's to purchase the shoes, and then to Wal-Mart to purchase groceries.

20. Defendant said she had been driving the Lexus for one year and has the only key. She said the car is registered under her father's name. She lives in a private residential area in Tijuana (i.e., her complex is gated).

21. Defendant provided an overview of her activities for the past few days. She said she went to a night club in Tijuana, Pueblo Amigo, with two of her friends on Friday, March 15, 2019. She said they arrived at the night club around 10:00 p.m., used the valet parking, and stayed at the club until around 5:00 a.m. on Saturday morning. She said she drove the Lexus to her home in Tijuana. On Saturday, March 16, she claimed she went to a florist and then to her cousin's party. She stated the Lexus was parked on the street during her cousin's party. On Sunday, March 17, she said she played softball and then went to see a movie with her mother.

22. On the day of her arrest, March 18, she claimed she left her residence at around 2:10 p.m. and went shopping near the border. She claimed she drove back home to drop off food she had purchased and then left her house around 4:30 p.m. to meet Daniel Sanchez

near the border at around 5:00 p.m. During this meeting, Daniel Sanchez provided her the $400 to purchase shoes for his girlfriend. Other than the valet at Pueblo Amigo, Defendant said she had not provided anyone else with access to her vehicle during the days leading up to her arrest.

## C.   DEFENDANT'S BORDER CROSSING HISTORY

23.   Defendant has a SENTRI card and crosses the border fairly frequently. She almost always crosses the border in the Lexus she was driving on the day of her arrest. During the approximately six months leading up to her arrest, she crossed the border into the United States approximately 19 times. Out of those 19 crossings, 16 were in the Lexus, 2 were via pedestrian lanes, and 1 was in a different vehicle. Defendant was also the only person to drive the Lexus into the United States during this period, except for a single crossing on January 19, 2019. On multiple occasions, Defendant drove the Lexus into the United States and then the Lexus drove out of the United States less than one hour later. For example, on December 26, 2018, the Lexus drove back into Mexico approximately 21 minutes after entering the United States, and on January 3, 2019, the Lexus drove back into Mexico approximately 25 minutes after entering the United States.

24.   Based on my experience investigating narcotics smugglers, Defendant may have used the **Target Device** to coordinate with the other parties involved regarding the importation of methamphetamine. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the **Target Device**. This data may include information that is relevant to Defendant's narcotics trafficking activities, including identifying other persons involved in their narcotics trafficking activities.

25.   Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. All parties involved communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States.

8

Accordingly, probable cause exists to believe that evidence of the aforementioned offenses exists on the **Target Device** for the period of December 18, 2018 to March 18, 2019.

## III

## METHODOLOGY

26. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## IV
## CONCLUSION

29. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Defendant utilized the **Target Device** to facilitate the commission of the Target Offenses.

30. Further, probable cause exists to believe that evidence of the aforementioned offenses exists on the **Target Device** for the period of December 18, 2018 to March 18, 2019.

31. Because the **Target Device** was promptly seized during the investigation of Defendant's drug trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activity committed by Defendant continues to exist on the **Target Device**.

//
//
//
//
//
//
//
//
//
//

32. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachment B (incorporated herein) are likely to be found in the property to be searched described in Attachment A (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachment A, and seize the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Andrew Crotzer
Homeland Security Investigations

Sworn to and subscribed before me this ____5____ day of June, 2019.

_____
HON. WILLIAM V. GALLO
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched in connection with an investigation of violation of Title 21, United States Code, Sections 952, 960, and 963 (Unlawful Importation of a Controlled Substance and Conspiracy to do the Same), Title 18, United States Code, Section 2 (Aiding and Abetting Unlawful Importation a Controlled Substance), and Title 21, United States Code, Section 843(b) (Unlawful Use of a Communication Facility):

> Apple iPhone
> Model 6
> IMEI: 359230066633850
> Serial Number: DNQPM2XZG5MC
> **(Target Device)**

The **Target Device** is currently in the possession of the Department of Homeland Security, Homeland Security Investigations as evidence and being held in the vault located at 9495 Customshouse Plaza in San Diego, California.

## **ATTACHMENT B**

Authorization to search the **Target Device**, described in Attachment A, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of December 18, 2018 to March 18, 2019:

a. tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 (Unlawful Importation of a Controlled Substance and Conspiracy to do the Same), Title 18, United States Code, Section 2 (Aiding and Abetting Unlawful Importation a Controlled Substance), and Title 21, United States Code, Section 843(b) (Unlawful Use of a Communication Facility).